Good morning, may it please the court, counsels, your honors, we're here today because the district court erred in granting summary judgment in favor of defendant appellee, central DuPage physician group. With your permission, I'll refer to this entity as RMG, as it is in the brief. Your honors, there were three errors in the district court's decision and analysis that warrant reversal. The first very significant legal error that occurred is that the district court applied an incorrect causation standard in deciding whether Dr. Richardson could prove his age discrimination claim. The second error is that the district court impermissibly weighed evidence and made reasonableness determinations regarding the honesty of the decision maker's beliefs in Dr. Richardson's capabilities and willingness to perform certain work, which reasonableness decisions should be made by a jury. They are, in this circuit, called notoriously inappropriate for summary judgment, and in a case such as this, such credibility determinations are notoriously and should be, are notoriously inappropriate and should not be made by a judge reading the papers. I was wondering if you can clear up something for me. There's some testimony by, I believe, Dr. Brayton with regard to the limits that Dr. Richardson's insurance may place upon his ability to practice. I think there was some testimony by Dr. Brayton that Dr. Richardson's insurance prohibited from being the primary physician, for example, on a case. And I'm wondering if you could explain to me what limitations, if any, his, Dr. Richardson's insurance had. Yes. Thank you for that question. And I did anticipate it, and I wish the record were fleshed out more on that. There was testimony about something to do with his insurance, but the fact is nothing about Dr. Richardson's licensure was limited. He was board certified, fully licensed, fully capable to perform as a primary neurosurgeon in any case that could come into the hospital. But there was reference to the insurance limitations, and I'm not sure, unfortunately, it was not fleshed out in the record what those were. Because my understanding is that typically, at least from the record, that typically they that his insurance situation and the way that it was reimbursed was different from the other neurosurgeons or the other physicians that were in the practice. Correct. And that could be part of the situation. And Dr. Richardson's employment agreement actually discusses reimbursement and insurance issues to a degree, not specifically saying he's impacted by them, but it is a topic that comes up in physician contracts. So I know Dr. Brayton did testify to it, but he himself was not truly very conversant in the insurance limitations, and Dr. Richardson himself did not concede that there were limitations that would have prevented him in black and white terms from working at Central DuPage Hospital. So it's not fleshed out in the record well, but I think Dr. Richardson's position would be he could have performed at Central DuPage Hospital. Is that, should we evaluate that in terms of objective proof of such limits or what the relevant decision maker thought were the limits? I don't believe the relevant decision makers even gave that factor much weight whatsoever. It was definitely not raised as one of their primary reasons for terminating Dr. Richardson. And I don't think either Dr. Jerome or Dr. Town exhibited any familiarity with the insurance limitations if it was an issue, if it existed at all. But doesn't it go to whether or not, it seems to me that Dr. Town and Dr. Jerome, the way they saw Dr. Richardson was that he wasn't able, their perception seems to have been that he was not able to perform, for one reason or another, all of the duties that one would expect from a typical neurosurgeon in that practice. For example, he didn't cover both hospitals, right? It's not clear from the record whether he was able to cover a call by himself. We have this kind of insurance situation to the extent that Dr. Brayton kind of talks about that. And so doesn't it go to that, that their honest belief that when they're kind of doing their business analysis that Dr. Richardson had some limitations that other physicians didn't? Yes, it is relevant to that issue. And I would ask the court to acknowledge, however, that the ultimate fact question here is the honesty of the decision-maker's proffered reason for terminating Dr. Richardson. And along the spectrum of honesty, which many courts and decisions in the circuit have said, is a question of reasonableness. How reasonableness is a decision-maker's belief in something? So here, I would proffer to you that the evidence does not support a finding of reasonableness. And that directly contradicts the district court's determination. She made a reasonableness determination as to their testimony, the decision-maker's testimony, five or six times in her decision. And I would ask you to question how reasonable is it for these doctors, neither of whom ever worked personally with Dr. Richardson, neither of whom met with him despite the terms of the employment agreement, which required them to consult and confer with him. The agreement contractually requires an open channel of communication under a dispute resolution provision that says you must meet and confer about any issues that arise regarding your work pursuant to this contract. Ms. Carlucci, in addition to that issue, you would have to show also that the reasons they gave were a pretext for age discrimination. Yes. What evidence in the record connected the COVID work-from-home instruction to the ultimate termination? Well, we believe, as was also argued in the McCoy decision, which we cite out of this circuit, that the—where there were two steps to the employee's termination. In that case, there was a transfer of position and then an ultimate discharge. We liken the situation to that because, first, there was the stay-at-home order due to COVID that was applied only to Dr. Richardson and no one else in the department. So that was step one, and what we would argue was an ultimate singular decision to discharge him. The COVID crisis, a juror could infer, gave the defendants a great reason to get Dr. Richardson out. Sent him home— I know you would argue that, but what literal evidence was there that connected his COVID working-from-home to his termination? It seemed like the explanations and the discussion around his termination were sort of independent, or at least I didn't see. Maybe I missed it. The district court definitely treated them as separate and independent acts, but that is an ultimate fact question. How did defendants' treatment of Dr. Richardson in the months preceding his termination, the four, five, six months preceding his termination, were they related to his ultimate termination? And how did the inferences that should flow from their treatment of him, from their sending him home, necessarily making him less productive? There are productivity issues raised. He necessarily became less productive when he was forced to work from home. He couldn't see patients. He's a physician. So I think that those are inextricably intertwined issues in how he was treated, how he was sent home, and that his productivity necessarily would go down, and he was ultimately terminated—requested permission to return to work multiple times, was expressly told no because of his age, and the inconvenient fact that his age would put him at higher risk for complications from COVID if he were to contract it. It's all part of a process and a singular line of events that led to his discharge, and I think if there's any doubt in that regard, a jury has to decide that. We should not decide that on the papers. You have about a minute and a half left. Would you like to reserve that for rebuttal? I will. Thank you. Ms. Cooper, good morning. Good morning. May it please the Court. So the parties are operating on two wholly different records for purposes of this appeal. Dr. Richardson, as we just witnessed, would like to consider evidence that was never submitted to the district court on summary judgment, or if the facts were submitted to the district court, the district court deemed them inadmissible. So two examples that counsel just mentioned. One, Dr. Brayton told him to go home because of his age in March 2020. That was not the case. As the district court correctly found, the cited testimony showed that Dr. Brayton only told Dr. Richardson to shelter at home and didn't even reference age. And then another example of that is counsel just said it is undisputed that Dr. Richardson was the only neurosurgeon who was never permitted to return to work at R&G in person. Again, the district court rejected this assertion as unsupported by the cited testimony because the testimony actually only stated that Dr. Brayton was not himself aware of anyone else being ordered to stay home, which is not the same as what counsel just stated. Didn't Dr. Richardson testify, however, that Dr. Jeromey told him to stay home because if he came back to work, he would be a goner? Wasn't that the words that at least Dr. Richardson used? Well, actually, that argument was not developed before the district court. But in any event, that's based on his own inference that Dr. Jeromey was referring to his age. So the exact quote is that Dr. Jeromey made comments about how Dr. Richardson would fare on a ventilator. And so he offers no authority for drawing this inference to his age as opposed to any other pre-existing condition. But what other reason could there have been? I mean, did Dr. Richardson have some sort of health issue that Dr. Jeromey knew about that led him to say that? Because it seems like the only reason back during COVID was because of his age and the notion that older people are more susceptible, particularly at that time, you know, with regard to ventilation and whatnot. That seems to be at least a reasonable inference. Well, that was never asked of Dr. Jeromey, you know, whether he made those comments, what he meant by those comments. So we are making an inference there. And, you know, we do have a case that we cited to, Skiva versus Illinois Central Railroad Company in the 7th Circuit in 2018. And that's, in that case, they declined to draw an inference of age-based discrimination from a comment about retirement eligibility for the same reason that, you know, retirement may be based on age, years of service, or a combination of the two, but not necessarily age. So the, it seems to me that what Dr. Towns and Dr. Jeromey were saying is that they had a business reason to terminate Dr. Richardson. And they talked about RVUs and costs versus revenues generated by the neurosurgeons. But Dr. Richardson was being paid only slightly more than other APPs, right? That's correct. So, as I understand, he was getting $180 and other APPs were getting $160? Yes. And so one would think that even though Dr. Richardson may not have generated the same revenue as the other neurosurgeons, he wasn't, the practice wasn't incurring as much cost because of his salary, right? And so doesn't that kind of put into question the overall justification, the business case that Dr. Towns and Dr. Jeromey were making about why they needed to terminate Dr. Richardson? Well, I would say, first of all, that argument, those facts are not in the record, what the cost was. But we know his salary, right? Yes, we do. I mean, he was being paid. Do we know how much his insurance reimbursement was? No. Okay. We do not have that in the record. Do we have, is there anything in the record about how much cost the practice was incurring for his employment versus the employment of a nurse anesthetist or a physician assistant? No, we do not. But Dr. Town believed that terminating Dr. Richardson's employment agreement would put RMG in a better position to raise the collective productivity of everyone, of all of the neurosurgeons, and that would give him the justification he needed to get another neurosurgeon, to have the approval to obtain another neurosurgeon. And again, the question here is, is that pretext? Not is that a for-business decision, but is that actually dishonest? And what do we make of the fact that the practice, that even though Dr. Towns and Dr. Jeromey said that the reason why they needed to terminate Dr. Richardson was because they wanted to hire more neurosurgeons, the fact that they didn't hire another one for another two or three years, right? Right. Well, there were two reasons, and the district court highlighted one. And one of those reasons is because of COVID, the amount of work that the neurosurgeons did was actually decreased, right? So the non-trauma-related outpatient type of procedures, they weren't doing as much during COVID. But second, it's back to my earlier point that I made, that doesn't Dr. Towns believe that it would justify, you know, there would be now a financial justification to add a neurosurgeon? It doesn't have to be correct. So he could have been incorrect. But that doesn't mean that it was a dishonest reason, you know, for him believing that that was a valid business justification. Why did it take so long to hire another neurosurgeon? Well, it took so long because they needed approval, and that took a while in terms of getting the necessary approvals at the hospitals. But then, as I said, also, you know, that was partly contributed to the fact that there just wasn't a lot of surgery, you know, elective surgeries being done. Ms. Cooper, we have cases that draw or at least permit inferences of pretext when employers fail to comply with procedural requirements or standards for discipline or termination. Could you address Blaine's point about failure to communicate and confer with Dr. Richardson before terminating? So, yes, I can. And my first comment on that is that argument was never raised before the district court. So this is the first time that we are hearing that. But, you know, I don't think that that in any way, specifically what that contract says, that, you know, you have to confer about any performance deficiencies or any issues. There were no performance issues here, right? It was the productivity of the role envisioned. It was not the productivity of Dr. Richardson. It was that that role, no matter who was in that role, was not consistent with RMG's go-forward business plans. I also wanted to mention that, you know, there are two different rationales, business justifications. So we did mention the collective productivity issue. The second one is this enhanced APP care model as well. So there are two separate justifications here. And on appeal, Dr. Richardson failed to address the first one, the productivity one, because he misunderstood it to be a performance-based deficiency. But, again, we're not arguing that it's performance-based, it's productivity. So this failure to address this but-for cause in terminating Richardson's employment agreement should prove fatal. And then the second, as I said, was this APP care model. And I think it's very important to note that Dr. Richardson, before the district court, at summary judgment, did not dispute, or I should say did not properly dispute, any of the statement of material facts that RMG proffered relating to this enhanced care model. Instead, his only objection was you only produced testimony, deposition testimony evidence, in support of these facts, and no documentary evidence. So, therefore, I'm disputing it. And, of course, that's not a valid objection because Federal Rule of Civil Procedure 56C1A states that deposition testimony can be used to support factual assertion. Any other questions? Oh, sorry, I should address the sole cause issue. So we believe that the district court used the sole cause language very specifically when talking about the sole reason that Dr. Richardson proffered for his age discrimination, for his termination, which was age discrimination. So that's the small part of the decision where the district court does use that language. But throughout the opinion, she does cite the correct but for causation standard. And in any event, obviously this court can, with its de novo review, affirm in any event. Thank you. Did you have any questions? Judge Hamilton, anything else? No, thank you. Your Honor, I will start from where we ended, which is my reading of the district court's opinion is exactly the opposite of what counsel just said. The district court may have referenced the but for cause standard in her, I'll call it, boilerplate recitation of black and white case law and unemployment discrimination cases. But it is throughout the decision at least three times where she uses the sole proximate cause standard. And it's not how I just heard that described. The way the judge mentioned it is Dr. Richardson cannot prove that his age was the sole cause in his termination. She said it three different times that way. So I think it's absolutely indisputable that the judge applied the wrong standard. She may have given reference to the correct standard in her boilerplate statement of the law. But when she was actually doing her analysis three times, she said he is failing to prove age was the sole cause of his termination. Another thing I wanted to address is the failure to produce the PowerPoint or any documentation of the implementation of this APP care model. Your Honor, if this was such an important strategic initiative to a large corporate organization like RMG, it is almost, it strains credulity to believe that there is no documentation of it whatsoever. We're going to fire an experienced neurosurgeon and we're purporting to roll out this new care model or we're going to finally enhance it and use it more often. But there's zero documentation of it. Anyone who's worked in a corporate setting knows there are meetings and memos about the minutia. If they are truly rolling out this new APP care model, which by the way, there was testimony that it existed, unrefuted testimony that it existed when Drs. Richardson and Brayton joined this practice. Dr. Brayton unequivocally said and it was not disputed factually that this care model has always been in existence. At least since 2017 when they joined RMG, APPs were used to support the neurosurgery practice. So it was not a novel or new care model. Now if the decision makers or the entity decided we're going to really ramp it up and start implementing it, where's the evidence of that? As Justice Lee noted, the only evidence was that a neurosurgeon was hired three or four years after Dr. Richardson was terminated and no evidence really about new APPs being hired. Ms. Bertolucci, if you could wrap up, please. So the only evidence of this rollout or implementation of this care model was Dr. Richardson's termination. So that along with the non-production of the sole document that allegedly documents this APP care model, the strange circumstances behind Dr. Richardson being sent home during COVID and never allowed to return to work, Dr. Jerome's obviously discriminatory comment. We don't need case law to tell you that it's a discriminatory comment. And then the failure to confer under the employment agreement, that is substantial evidence of pretext that should be considered by a jury. Thank you. Thank you. Thank you, counsel. We'll take the case under advisement.